264 F.2d 847
 MORSE BOULGER DESTRUCTOR COMPANY, a Delaware Corporation,
and Fidelity & Deposit Company of Maryland, a
Maryland Corporation, Appellants,
v.
CITY OF SAGINAW, a Municipal Corporation, Appellee.
 No. 13571.
 United States Court of Appeals Sixth Circuit.
 March 24, 1959.
 
 Frederic S. Glover, Jr., Detroit, Mich. (Moll, Desenberg, Purdy & Glover, Detroit, Mich., Englander & Englander, New York City, on the brief), for appellants.
 William A. Boos, Jr., Asst. City Atty., Saginaw, Mich. (W. Vincent Nash, City Atty., Saginaw, Mich., on the brief), for appellee.
 Before ALLEN, McALLISTER and MILLER, Circuit Judges.
 ALLEN, Circuit Judge.
 
 
 1
 This case arises out of the erection of a sewage incinerator for appellee, the City of Saginaw, a Michigan municipal corporation, hereinafter called the City, by appellant Morse Boulger Destructor Company, a designer and builder of incinerators, hereinafter called Morse Boulger. The incinerating plant was installed and operated a month on a trial run basis during April, 1953, by two of Morse Boulger's employees. In May, 1954, in the center shaft of the incinerator cracks appeared, which have grown larger during the succeeding years. However, the incinerator has continued to operate satisfactorily so far as the reduction of sewage for the city is concerned.
 
 
 2
 The complaint filed by the City asked for money damages for breach by Morse Boulger of express and implied warranties and for specific performance to require Morse Boulger and its co-appellant surety to replace the center shaft of the incinerator. Appellants admitted the existence of the cracks but denied that they were due to defects in the shaft or that they were caused by faulty design or faulty or inferior workmanship. Morse Boulger asserted that the cracks were caused by excessive operating temperatures, which were due to the fact that the sludge incinerated in the plant contained moisture content of only 55% to 65%, whereas under the contract of the parties the plant was designed to handle sludge containing moisture content of approximately 70%.
 
 
 3
 The trial court held that the cracks were due to faulty design. It found specifically that the city had not proved the existence of faulty material and no evidence as to faulty workmanship was given. However, the trial court gave judgment for $900 damages, which it considered would compensate the City for the cost of a two-weeks shutdown in order to install a new center shaft in the plant. The judgment also ordered Morse Bouler to supply a new shaft 'of a proper alloy sufficient to do the job.'
 
 
 4
 The contract executed by Morse Boulger required it, upon completion of the plant and before final payment, to furnish the City with a written guarantee agreeing to repair or remedy without expense to the City any defects caused by faulty design or faulty or inferior workmanship, for a period of one year after the date of the final payment under the contract. While it does not appear that such a written guarantee was executed, the case is argued upon the theory that this agreement constituted an express warranty of design and workmanship. The cracks appeared in the center shaft of the incinerator during the one-year period.
 
 
 5
 The District Court found that the furnace was not designed to do the work contemplated and that this constituted a breach of express warranty. It stated there was no doubt that the facts show that the moisture content of the sludge was not as specified in the contract and that the City had definitely failed to show that the material used in the construction of the center shaft was not 'heatresistant cast iron', as specified. It stated that if the City were to rest its case entirely upon these particular claims the judgment must be for Morse Boulger. It concluded that Morse Boulger's agents who were operating the one-month test run knew that sludge of 70% moisture content was required, but did not bother to inform the City of the fact nor of the fact that the plant erected could not handle a 55% to 65% moisture content sludge. The court held that under the record Morse Boulger did design a plant for 70% moisture content when it should have designed one for 55% to 65% moisture content, or at least should have warned the City that the plant Morse Boulger had designed was not able to do the job.
 
 
 6
 We think these conclusions are erroneous. The contract contained extensive specifications drawn by the City's consulting engineer as to the structure and capacity of the furnace and also as to the conditions under which the sludge was to be incinerated. Morse Boulger was required to install an incinerator of a multiple hearth mechanically-rabbled type with at least six hearths, whose dimensions, manufacture and design were described in considerable detail. The center shaft was to be composed of 'high grade heat-resistant cast iron' and the District Court found that plaintiff had not shown that this provision had been violated. Extensive provisions as to the design of the center shaft were approved, as were all provisions of the contract, by the City's consulting engineer. The sludge which was to be incinerated was stated to be 'sewage sludge dewatered to approximately 70 per cent by vacuum filters.' It is uncontradicted that this provision was not complied with and so held by the court. However, the court decided that the City relied upon Morse Boulger as an expert to put in a sewage disposal plant that 'would do the job' and that Morse Boulger knew, or should have known, that the moisture content of the sludge would be nearer 55% to 65% than 70%. Down to June 1955, the current average for moisture content was near 55.7%. Evidence was introduced that the heat resulting from the operation would inevitably be higher for each pound of material as the moisture content went down and that a furnace designed to handle 55% moisture content sludge would necessarily be larger, have more furnace volume, and more provision for cooling than a furnace designed to handle 70% moisture content sludge. The machine was properly designed to operate under the specifications given. The plans for the furnace were approved by the City's consulting engineer. The failure of the furnace to meet the situation due to the lower moisture content of the sludge was not a failure of design.
 
 
 7
 The fact that Morse Boulger's employees who operated the incinerator during the trial run did not report on the moisture content of the sludge does not give rise to a cause of action against appellants. The provision as to moisture content of the sludge was written by the City's consulting engineer and Morse Boulger was not required to give the City notice of this provision. Moreover, it was not shown that Morse Boulger's employees checked on or were aware of the precise moisture content, nor that Morse Boulger was apprised of the lack in moisture content of the sludge until after the center cracks appeared. Under the specifications Morse Boulger was entitled to assume that 70% of moisture content would be supplied by the City.
 
 
 8
 Similar observations are pertinent with reference to the court's holding that there was violation of an implied warranty under Section 15 of the Uniform Sales Act. The City, the buyer, did expressly make known to the seller the particular purpose for which the goods were required and did rely upon the skill and judgment of the seller. However, if the buyer in making the contract prepares specifications and the machine or article bought is constructed in accord with those specifications, no breach of the implied warranty of fitness arises. 2 Mechem, Sales, Section 1349. This is also the rule under Michigan law. Beaman v. Testori, 323 Mich. 194, 35 N.W.2d 155, 157. In this case the buyer submitted designs and specifications for a mold manufactured by the seller, delivered to the buyer, which did not operate satisfactorily. The court held there was no implied warranty of fitness. The court stated '* * * defendants here did not rely upon plaintiffs' judgment and skill to produce a mold which would work, but relied upon them only to build one in accord with the designs and specifications furnished by defendants. The undisputed testimony is that plaintiffs did build it in accord therewith.' To the same effect see Salzman v. Maldaver, 315 Mich. 403, 416, 24 N.W.2d 161, 168 A.L.R. 381, citing 2 Mechem, Sales, Section 1349, and several Michigan cases. Here the plant furnished by Morse Boulger was built in accordance with the specifications drawn by the City's consulting engineer.
 
 
 9
 There is no proof here that the furnace was not reasonably fit to incinerate sludge which conformed to the specification as to moisture content given by the City.
 
 
 10
 There being no violation of warranty, either express or implied, there can be no recovery of damages.
 
 
 11
 That part of the judgment relating to the City's prayer for specific performance required Morse Boulger to 'place upon the site of the disposal plant' a new shaft of the 'proper alloy sufficient to do the job.' On its face this decree is indefinite and unenforceable. The record does not show what is the proper alloy sufficient to do the job. The specifications in the contract calling for 'high grade heat-resistant cast iron' were found by the District Court not to have been shown to have been violated. The judgment requires Morse Boulger to furnish a center shaft of an alloy that would do the job under conditions not specified in the contract and in absence of any evidence as to the physical and chemical characteristics of the alloy required.
 
 
 12
 The judgment is reversed and judgment is entered in favor of appellants.